**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| PEARSON EDUCATION, INC. et al.,<br><br>                           Plaintiffs,<br>       -against-<br><br>DOE 1 D/B/A ANYTHING YOU CAN IMAGINE et al.,<br><br>                      Defendants. | Case No.: 1:18-cv-07380-PGG |

## DEFENDANT BORGASORUS BOOKS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

FACTS...................................................................................................2

    The Challenged Books.........................................................................2

    BBI's Legitimate Family-Owned Business................................................4

ARGUMENT.............................................................................................6

    Plaintiffs Cannot Show Irreparable Harm..................................................7

    Plaintiffs Elsevier and Bedford Have No Claims Against BBI............................14

    Plaintiffs McGraw-Hill and Pearson Have Not Demonstrated Likelihood of Success on the Merits of Their Copyright Infringement Claim.........................................14

    The Balance of Hardships & Public Interest Also Dictate That a Preliminary Injunction Should Not Enter...............................................................15

    The Scope of the Injunctive Relief Sought Is Overwhelmingly Excessive.................17

    Plaintiffs Must Post a Bond if a Preliminary Injunction is Entered..........................20

CONCLUSION..........................................................................................21

## TABLE OF AUTHORITIES

| | |
|---|---|
| *Asia TV USA, Ltd. v. Total Cable USA LLC*, No. 16-cv-6873 (AJN), 2018 U.S. Dist. LEXIS 54026 (S.D.N.Y. Mar. 29, 2018) | 20 |
| *Battelle Energy All., LLC v. Southfork Sec., Inc.*, 980 F. Supp. 2d 1211 (D. Idaho 2013) | 9 |
| *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985) | 7, 8, 9 |
| *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114 (2d Cir. 2011) | 18 |
| *DISH Network, L.L.C. v. ABC, Inc. (In re AutoHop Litig.)*, No. 12 Civ. 4155, 2013 U.S. Dist. LEXIS 143492 (S.D.N.Y. Oct. 1, 2013) | 8, 10 |
| *Dun v. Lumbermen's Credit Ass'n*, 209 U.S. 20 (1908) | 15 |
| *Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc.*, No. 16-cv-5079, 2016 U.S. Dist. LEXIS 107358 (S.D.N.Y. Aug. 12, 2016) | 8 |
| *Geritex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955 (S.D.N.Y. 1996) | 13 |
| *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27 (2d Cir. 2016) | 17, 18 |
| *Ideavillage Prods. Corp. v. Bling Boutique Store*, No. 16-CV-9039, 2017 U.S. Dist. LEXIS 61189 (S.D.N.Y. Apr. 21, 2017) | 9 |
| *Kamakazi Music Corp. v. Robbins Music Corp.*, 534 F. Supp. 57 (S.D.N.Y. 1981) | 12 |
| *Kohler Co. v. Bold Int'l FZCO*, No. 17-CV-4233, 2018 U.S. Dist. LEXIS 103430 (E.D.N.Y. June 19, 2018) | 7 |
| *Little Tor Auto Ctr. v. Exxon Co. USA*, 822 F. Supp. 141 (S.D.N.Y. 1993) | 21 |
| *Pearson Educ., Inc. v. Ishayev*, 9 F. Supp.2d 328 (S.D.N.Y. 2014) | 7 |
| *Psihoyos v. John Wiley & Sons, Inc.*, 2011 U.S. Dist. LEXIS 115835 (S.D.N.Y. Oct. 3, 2011) | 17 |
| *Richard Feiner & Co. v. Turner Entm't Co.*, 98 F.3d 33 (2d Cir. 1996) | 9 |
| *Rosenfeld v. Saunders*, 728 F. Supp. 236 (S.D.N.Y. 1990) | 15 |
| *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) | 7, 12 |

*Small Bus. Bodyguard, Inc. v. House of Moxie, Inc.*, No. 14-cv-7170 (CM), 2015 U.S. Dist. LEXIS 45791 (S.D.N.Y. Apr. 6, 2015) ... 7

*Sterling Commercial Credit-Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8 (D.D.C. 2011) ... 12

*Sterling Drug, Inc. v. Bayer*, 14 F.3d 733 (2d Cir. 1994) ... 17

*Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964 (2d Cir. 1995) ... 8, 9

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ... 6, 7

Fed. R. Civ. P. 65 ... 20, 21

Borgasorus Books, Inc. ("BBI" or "Defendant"), respectfully submits this memorandum of law in opposition to the motion for a preliminary injunction submitted by Plaintiffs Pearson Education, Inc. ("Pearson"), Cengage Learning, Inc. ("Cengage"), Elsevier Inc. ("Elsevier"), McGraw-Hill Global Education Holdings, LLC ("McGraw-Hill"), and Bedford, Freeman & Worth Publishing Group, LLC ("Bedford") (collectively "Plaintiffs" unless otherwise specifically designated)[1].

## I.   <u>FACTS</u>

This case has been brought by five (5) legally distinct entities with no discernable connection other than their alleged shared status as entities engaged in the field of educational publishing.  ECF No. 1 (hereinafter "Compl.") at ¶2.  Plaintiffs' collective, alarmist rhetoric regarding mass trademark and copyright infringement engaged in by "Defendants" without distinction can be easily set aside by reference to the facts alleged in this case described below.

a.   <u>The Challenged Books</u>

Only three (3) plaintiffs—Pearson, McGraw-Hill, and Cengage—assert claims against BBI stemming from six (6) discrete transactions concerning only five (5) books.  *See* Compl. Ex. B, ECF No. 1-2 (referencing BBI with respect to copyright nos. 8, 21, 65, 67, and 83 only); ECF No. 7-1 at 1 (grouping six alleged transactions involving BBI), excerpted in relevant below:

---

[1] While muddled, and difficult to discern insofar as allegations are lobbed collectively without distinction by five (5) different plaintiffs without differentiation against twenty-two (22) different defendants, only three (3) plaintiffs appear to assert claims against BBI:  Pearson, Cengage, and McGraw Hill. *See* ECF No. 7-1 at 1 (referring to six transactions fulfilled by BBI regarding only three publishers).

| No. | Publisher (Plaintiff) | Title | ISBN | Marketplace | Transaction Date |
|---|---|---|---|---|---|
| 1 | Pearson | Exploring Research, 8th ed. | 9780205093816 | Valore | 7/24/2017 |
| 2 | Pearson | Business In Action, 8th ed. | 9780134129952 | Alibris | 3/15/2018 |
| 3 | McGraw-Hill | Strategic Management: Concepts, 3rd ed. | 9781259420474 | Alibris | 5/22/2018 |
| 4 | Cengage | Communication Between Cultures, 9th ed. | 9781285444628 | Abebooks | 4/26/2018 |
| 5 | | | | Valore | 7/17/2018 |
| 6 | Cengage | Interviewing For Solutions, 4th ed. | 9781111722203 | Valore | 7/17/2018 |

The blanket notion that, without distinction, "There is no question that Defendants are infringing Plaintiffs' copyrights" is patently false. ECF No. 5 at 36. BBI is alleged to have sold only five (5) copyrighted works of Plaintiffs Pearson, McGraw-Hill and Cengage, of the more than one-hundred (100) characterized as "Plaintiff's copyrights" set forth in Exhibit B to the Complaint. *See* ECF No. 1-2 (referencing defendants with respect to copyright nos. 8, 21, 65, 67, and 83 only); ECF No. 5 at 36. No books, or intellectual property of Plaintiffs Elsevier or Bedford are implicated with respect to Defendant BBI.

Likewise, among the nine (9) trademarks alleged in this action (*see* ECF No. 1-3), BBI is alleged to have infringed only five (5) allegedly owned or exclusively licensed by Pearson, McGraw-Hill and Cengage: (1) ALWAYS LEARNING; (2) BROOKS/COLE; (3) CENGAGE LEARNING; (4) MCGRAW HILL EDUCATION; and (5) PEARSON. Again, no trademarks of Elsevier or Bedford are alleged to have been violated by BBI. *See* Compl. Ex. C, ECF No. 1-3.

BBI maintains a list of approximately 300,000 books in inventory at the current time. *See* Declaration of Jennifer Grooms dated September 5, 2018 filed concurrently herewith (hereinafter "Grooms Decl."), ¶15. For years, BBI purchased books from Missouri Book Company ("MBS"), a subsidiary of Barnes & Noble which is the largest national bookseller chain with operations at over 750 college campuses and serving over 6 million students. *Id.* ¶7. According to MBS,

3

Plaintiffs discovered through other, prior litigation that MBS may have sold allegedly counterfeit books to BBI, yet never advised BBI that this occurred. *Id.* ¶17.   Based on information gleaned from this prior litigation, Plaintiffs executed targeted test purchases of titles that they already learned may have been counterfeited by third parties (not including BBI). *Id.* ¶18.

BBI records indicate that while the Plaintiffs claim they purchased six counterfeit books, they actually made at least twenty-one (21) targeted purchases from BBI, dating back to at least as early as June 6, 2017. *Id.* ¶19.   Upon information and belief, these 21 purchases were titles that Plaintiffs believed would all be counterfeit. *Id.*   Plaintiffs were mistaken.   From among the hundreds of thousands of books BBI has listed in inventory, and an investigation spanning at least fourteen (14) months that included the twenty-one (21) test purchases of the Plaintiffs' agents, Plaintiffs have identified only six (6) transactions involving five (5) titles they claim are counterfeit.   With respect to the five (5) titles underlying Plaintiffs' claims in this action, BBI's records indicate that it does not have any copies of these titles currently in inventory. *Id.* ¶22.

### b.   BBI's Legitimate Family-Owned Business

BBI is a family-owned and operated Missouri corporation.   Grooms Decl. ¶3.   BBI has been in business for over a decade and currently employs eighteen (18) people. *Id.* ¶4.

BBI purchases used books, including entire lots of books from legitimate third party sellers pursuant to the custom and practice of the bookselling industry. *Id.* ¶6.   For years, BBI purchased books from Barnes & Noble's subsidiary, MBS. *Id.* ¶7.   MBS has adopted the anti-counterfeit best practices set forth on StopCounterfeitBooks.com. *Id.*   In addition, BBI purchases books from textbook wholesalers in the United States, from schools and school districts, from students, from eBay, and from other sources for eventual resale to consumers. *Id.* ¶8.  Upon receipt of used books from its sources, BBI undertakes a comprehensive review of the books to parse out books that

cannot be sold and/or have suspicious lineage. *Id.* ¶9. The procedures adopted by BBI include the "Best Practices" publicized on the StopCounterfeitBooks.com website. *Id.* The StopCounterfeitbooks.com website is endorsed by Plaintiffs in this action, Cengage, Pearson, McGraw-Hill, Elsevier and MacMillan (the parent of plaintiff Bedford Freeman). As such, these publishers all endorse the best practices to ensure that authentic books are sold. *Id.* ¶10. The books BBI purchases are resold to consumers via platforms such as Abebooks.com, Alibris.com, and Valore.com. *Id.* ¶11. Valore, has also adopted the Anti-Counterfeit Best Practices of StopCounterfeitBooks.com. *Id.* ¶12.

The allegations that BBI deliberately evades legitimate sources and instead sources illegal and counterfeit copies of Plaintiffs' works is false. *Id.* ¶13. BBI undertakes significant efforts to ensure the books it purchases are authentic. *Id.* It does not source books from China or suspicious sources. *Id.*

BBI maintains a corporate culture of weeding out any suspicious books, and withholding such books from commerce. *Id.* ¶14. Among other things, BBI provides employees with training on how to identify books that are not authentic, including a written training sheet. *Id.* Specifically, it employs a multi-tier process for identifying books that are potentially not authentic. *Id.* First, the books are measured and weighed, with the measurements and weight then compared to a listing of the book on the publisher's website or other seemingly legitimate source. *Id.* Second, the font, images, and binding of the books are examined for clarity and craftsmanship. *Id.* Any book that is identified as potentially not authentic is not listed for sale and is designated for recycling. *Id.* This process is repeated such that there are different evaluations performed; when the book is initially inspected, when it is listed, and when the book is shipped out for a sale. *Id.*

BBI has not and does not purposefully or negligently import, offer for sale, sell, or distribute counterfeit books. *Id.* ¶23. BBI did not know the six books that are alleged to be counterfeit were counterfeit. *Id.* ¶24.

The Temporary Restraining Order that was put in place is harming BBI and threatens the existence of its legitimate business. *Id.* ¶25. As discussed above, BBI takes great care in eliminating any suspect book from its inventory, as well as any book that does not pass the tests that comply with the StopCounterfeitBooks.com Best Practices. *Id.* ¶26. However, not unlike any supply chain, a counterfeit could infiltrate the supply despite that unit passing the Plaintiffs' own suggested tests. *Id.*

The vast majority of books the BBI purchases, especially the bulk lots, are discarded and sent for recycling. *Id.* ¶27. Currently BBI, has hundreds of thousands of books waiting to go to a recycler. *Id.* However, the injunction will prevent the transfer of these books for recycling. *Id.* As such, the storage of these books is occupying more and more of BBI's warehouse every day and BBI is running out of storage space. *Id.* These books are not going to be sold, and requiring BBI's storage of same is adversely impacting its ability to do business. *Id.*

## II.   **ARGUMENT**

The Supreme Court has pointedly cautioned: "A preliminary injunction is an extraordinary remedy." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the moving party must make the following four-pronged showing: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation"; (2) likelihood of irreparable harm in the absence of an injunction; (3) a balance of hardships tipping decidedly toward the party requesting the preliminary relief; and (4) that "the public interest would not be disserved by the issuance of a preliminary injunction."

*Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010).  Courts may not grant injunctive relief simply because a Plaintiff is likely to succeed in proving a defendant's liability for infringement. *Kohler Co. v. Bold Int'l FZCO*, No. 17-CV-4233, 2018 U.S. Dist. LEXIS 103430, *63 (E.D.N.Y. June 19, 2018); *Pearson Educ., Inc. v. Ishayev*, 9 F. Supp.2d 328, 342 (S.D.N.Y. 2014) ("An injunction [ ] is not mandatory and does not automatically follow a determination that a copyright has been infringed.").

<blockquote>a.  <u>Plaintiffs Cannot Show Irreparable Harm.</u></blockquote>

Plaintiffs' motion must be denied because they offer no evidence of irreparable harm beyond conclusory statements.  Additionally, Plaintiffs' unreasonable delay in seeking a preliminary injunction provides an independent basis to deny their motion.  A showing of irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction…" *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (citation omitted); *Small Bus. Bodyguard, Inc. v. House of Moxie, Inc.*, No. 14-cv-7170 (CM), 2015 U.S. Dist. LEXIS 45791, *11 (S.D.N.Y. Apr. 6, 2015) (citing irreparable injury to movant as "the *sine qua non* of the preliminary injunction").  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Salinger*, 607 F.3d at 79 (quoting *Winter*, 129 S. Ct. at 375-76). The Second Circuit has echoed the Supreme Court in holding that an injunction is "an extraordinary remedy never awarded as of right." *Salinger*, 607 F.3d at 79 (quoting *Winter*, 129 S. Ct. at 376-77).

To satisfy the "single most important prerequisite" for the relief they seek, Plaintiffs Pearson, McGraw-Hill, and Cengage apparently rely on the recitation of a single, non-specific

9267484v.1

paragraph of platitudes asserted verbatim in each of their corporate representative's respective declarations claiming:

> The sale of inferior counterfeit textbooks, by Defendants or anyone, undercuts [Pearson's / Cengage's / McGraw Hill's] ability to sell, and the perceived value of, its textbooks. Counterfeiting causes irreparable harm to [Pearson's / Cengage's / McGraw Hill's] brand, business reputation, and goodwill in the United States and throughout the world for quality, reputable textbooks, which, in turn, negatively affects [Pearson's / Cengage's / McGraw Hill's] relationships with students, authors, distributors, and other partners.

*See* ECF No. 5 at 39 (arguing irreparable harm with citation to ¶12 of Declarations of Essig (on behalf of Pearson), ECF No. 11, Stitt (on behalf of Cengage), ECF No. 8, and Rosenthal (on behalf of McGraw-Hill), ECF No. 9. Such "conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *DISH Network, L.L.C. v. ABC, Inc. (In re AutoHop Litig.*), No. 12 Civ. 4155, 2013 U.S. Dist. LEXIS 143492, *33 (S.D.N.Y. Oct. 1, 2013) (denying motion for preliminary injunction).

Moreover, delay on the part of the party seeking a preliminary injunction, standing alone, may justify denial of the injunction request, and at a minimum, undercuts a claim of irreparable harm. *Citibank,* 756 F.2d at 276 (vacating preliminary injunction when plaintiff delayed bringing suit for ten (10) weeks after obtaining direct knowledge of allegedly infringing business, and nine (9) months after receiving notice of the business in the press); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (vacating preliminary injunction when thirteen (13) months elapsed between when plaintiff first became aware of allegedly infringing product and moved for preliminary injunction); *In re AutoHop Litig.*, 2013 U.S. Dist. LEXIS 143492 at *34-35 (denying preliminary injunction when plaintiff waited between six months and a year before seeking relief); *Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc.*, No. 16-cv-5079, 2016 U.S. Dist. LEXIS 107358, *14 (S.D.N.Y. Aug. 12, 2016) (denying preliminary injunction when plaintiff delayed seeking same for at least twelve (12) months after becoming aware of

defendants use of marks at issue); *Ideavillage Prods. Corp. v. Bling Boutique Store*, No. 16-CV-9039, 2017 U.S. Dist. LEXIS 61189, *13 (S.D.N.Y. Apr. 21, 2017) ("[W]here the delay in asserting Plaintiff's intellectual property rights is unreasonable, a Court may, in its discretion, deny the injunctive relief sought.").

In trademark cases, a presumption of irreparable harm that usually follows a showing of a high probability of confusion "is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." *Tough Traveler*, 60 F.3d at 968; *Citibank*, 756 F.2d at 376 ("Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.").

Likewise, in a copyright infringement case, the presumption of irreparable harm that follows when a plaintiff establishes a prima facie case of copyright infringement "may be rebutted if the defendant is able to demonstrate that the plaintiff delayed in bringing an action requesting injunctive relief." *Richard Feiner & Co. v. Turner Entm't Co.*, 98 F.3d 33, 34 (2d Cir. 1996) ("An unreasonable delay suggests that the plaintiff may have acquiesced in the infringing activity, or that any harm suffered by the plaintiff is not so severe as to be irreparable.").

Any claim of irreparable harm is severely undercut by the significant delays between some of Plaintiffs' test purchases and the filing of this action. Here, Plaintiffs' delay in bringing suit, and seeking a preliminary injunction, has been months, and in at least one instance—more than a year. For example, one of the test purchases, that of Exploring Research, 8th ed., published by Pearson, took place over a year ago, in July 2017. *See* Doc. 7-1 at 2. A number of the other test purchases from other defendants took place in 2017 as well.

9

With respect to BBI specifically, approximately thirteen (13) months, five (5) months, four (4) months, three (3) months, and five (5) weeks have elapsed between the dates on which Plaintiffs purchased the allegedly counterfeit books and the date they filed suit. Pearson delayed between over a year and five months. McGraw-Hill delayed more than three months. Cengage delayed between approximately four months and five weeks.

Thus, Plaintiffs' claim that an immediate injunction at this time, the start of the 2018-2019 academic year, is crucial, falls flat, when they have in fact delayed for up to an entire academic year already. *See, e.g.*, *In re AutoHop Litig.*, 2013 U.S. Dist. LEXIS 143492 at *34-35; *Battelle Energy All., LLC v. Southfork Sec., Inc.*, 980 F. Supp. 2d 1211, 1219 (D. Idaho 2013) (holding that five month delay between discovering copyright infringement and seeking injunctive relief "seriously undermines" claim that immediate injunction is warranted).

Moreover, after initiating suit and obtaining a TRO, Plaintiffs allowed four (4) days to elapse before effectuating service of this Court's TRO by email—a straightforward and nearly effortless undertaking. *See* ECF No. 3 (TRO signed August 15, 2018); ECF No. 14 (certificate of service listing August 19, 2018 as the date of service of TRO and supporting papers). Any claim of immediate, irreparable injury is belied by Plaintiffs' delay in bringing suit combined with their delay is serving the TRO they purportedly so urgently needed.

Likewise, all of the allegedly infringing works sold by BBI were, upon information and belief, first published between two (2) and seven (7) years ago:

| No. | Publisher (Plaintiff) | Title | ISBN | Publication Date | Transaction Date |
|---|---|---|---|---|---|
| 1 | Pearson | Exploring Research, 8th ed. | 9780205093816 | 2011 | 7/24/2017 |
| 2 | Pearson | Business In Action, 8th ed. | 9780134129952 | 2016 | 3/15/2018 |
| 3 | McGraw-Hill | Strategic Management: Concepts, 3rd ed. | 9781259420474 | 2016 | 5/22/2018 |
| 4 | Cengage | Communication Between Cultures, 9th ed. | 9781285444628 | 2016 | 4/26/2018 |
| 5 | | | | | 7/17/2018 |
| 6 | Cengage | Interviewing For Solutions, 4th ed. | 9781111722203 | 2012 | 7/17/2018 |

Where all of these texts have been in circulation for a number of years, it can be expected that there are numerous available used copies from third party sellers. Accordingly, any claim that Plaintiffs are imminently likely to lose sales as the direct result of a tiny number of allegedly counterfeit copies is not well founded.

Despite these delays, Plaintiffs nevertheless attempt to claim that they will suffer irreparable injury because "Counterfeiters, like Defendants, are inundating the market with unauthorized copies of Plaintiffs' Authentic Works." ECF No. 5 at 38. A blanket, conclusory statement of this nature is insufficient to demonstrate that irreparable harm is imminent, and is inconsistent with the facts here. As noted above, Plaintiffs purchased twenty-one (21) books from BBI, of which they (unilaterally) determined six were counterfeit. Plaintiffs' test purchases targeted titles that they already knew had been counterfeited by third parties (not including BBI) and that the counterfeit copies had made their way into the stream of commerce. Grooms Decl. ¶¶17-18. Plaintiffs' sample size is thus both skewed and statistically insignificant. By no stretch of the imagination could the actual conduct alleged by Plaintiffs against BBI be accurately described as "inundating" the market.

Rather, the Plaintiffs have been able to identify two (2) out of every 100,000 books to be infringing. The complete list of titles offered by BBI is available and has been available since the

first time Plaintiffs made a purchase.  Had Plaintiffs believed there was an issue, they had the ability to stop such action last year.  But they declined to do so.  In addition, two (2) out of 100,000 is within an acceptable level of risk.  Pharmaceuticals and other dangerous products have been allowed to remain in circulation with a much higher incidence of harm.  No one is going to get sick or die from a counterfeit book.  The potential for harm is low.  BBI's practices to avoid the sale of counterfeits ensures that the incidence remains low.  *See* Grooms Decl. ¶¶6, 9-10, 13-14.

Moreover, Plaintiffs make no attempt to show that they could not be made whole by an award of damages or lost profits from the sale of allegedly infringing books, other than repeating quotes that "lost sales" can be "notoriously difficult" to prove. *See, e.g. Kamakazi Music Corp. v. Robbins Music Corp.*, 534 F. Supp. 57, 68 (S.D.N.Y. 1981) (denying preliminary injunction where "allegations presented in arguing the preliminary injunction do not sufficiently rule out the possibility of money damages being determinable"). Argument and rhetoric, without more, is insufficient to meet the Plaintiffs' burden of proof on this point. Rather, "plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." *Salinger*, 607 F.3d at 82.  Economic harm will only qualify as "irreparable" where a plaintiff establishes that the harm "is so severe as to cause extreme hardship to the business or threaten its very existence." *Sterling Commercial Credit--Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 15 (D.D.C. 2011).  Where there are no particular allegations and certainly no evidence that any infringing sales are likely to occur in the future, and certainly no claim that Plaintiffs' entire business is threatened by the alleged harm, Plaintiffs have not established entitlement to injunctive relief.

With respect to the harm resulting from the alleged trademark infringement, Plaintiffs have not offered any evidence of an actual decrease in sales attributable to BBI since the

12

allegedly infringing books entered the stream of commerce. *Geritex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 966 (S.D.N.Y. 1996) (denying preliminary injunction where plaintiff offered evidence of projected decrease in sales when there was no showing that the projected decrease was attributable to defendant's conduct). Instead, their arguments center on the hypothetical potential for lost profits. Plaintiff Cengage had revenues of approximately $1.5 Billion for the Fiscal Year ended March 31, 2018. *See* https://assets.cengage.com/pdf/Q4-FY18-Investor-Financials-VF-2.pdf, (last visited September 5, 2018). Pearson's half-year results for the six months ended June 30, 2018 showed sales of more than $2.4 Billion. *See* https://www.pearson.com/corporate/news/media/news-announcements/2018/07/pearson-2018-half-year-results.html, (last visited September 5, 2018). McGraw Hill showed revenue in excess of $662 million for the six months ended June 30, 2018 for its educational company only. *See* https://s22.q4cdn.com/942918855/files/doc_financials/quarterly-reports/2018/q2/MHE-2018.6.30-Quarterly-Report_FINAL.pdf (last visited September 5, 2018). Certainly, these are not companies whose profits have been harmed by BBI's sale of six (6) used books.

Finally, Plaintiffs have not alleged that consumers have been confused into thinking that their products are of an inferior quality by the fact that the books bore their marks. In fact, quite the contrary: Plaintiffs have included detailed and specific allegations that consumers have complained that particular books they purchased were not authentic—that they were "pirated" versions that were not the same quality as the genuine articles. What Plaintiffs have alleged here is the opposite of harm to their reputations; they allege that the consumers did not impute the alleged poor quality to the Plaintiffs, but instead concluded that the books were not authentic and blamed the sellers. This cuts against a finding of irreparable harm.

13

### b. **Plaintiffs Elsevier and Bedford Have No Claims Against BBI**

There are five Plaintiffs listed in the Complaint, each of which allege that "the Defendants," without differentiation, have infringed a host of their copyrights and trademarks by selling counterfeit books. A review of Exhibit B to Plaintiffs' Complaint reveals that BBI is only alleged to have sold counterfeit versions of titles published by Cengage (Communication Between Cultures, 9th ed.; Interviewing for Solutions, 4th ed.); McGraw-Hill (Strategic Management: Concepts, 3rd ed.); and Pearson (Business in Action, 8th ed.; Exploring Research, 8th ed.). ECF No. 1-2 (referencing defendants with respect to copyright nos. 8, 21, 65, 67, and 83 only); ECF No. 7-1 at 2. Plaintiffs Elsevier and Bedford do not claim that BBI sold counterfeit versions of any of their titles. Accordingly, to the extent Plaintiffs Elsevier and Bedford seek a preliminary injunction against BBI, they have not shown any likelihood of success on the merits. Any claim that BBI is currently or is likely to infringe Elsevier or Bedford's copyrights or trademarks would be sheer speculation. It is beyond dispute that Elsevier and Bedford are not entitled to injunctive relief as against BBI when their complaint in this action does not advance any claims against BBI.

### c. **Plaintiffs McGraw-Hill and Pearson Have Not Demonstrated Likelihood of Success on the Merits of Their Copyright Infringement Claim**

TX0008434038 is alleged to cover the book entitled "Strategic Management: Concepts, 3rd ed." *See* ECF No. 1-2 at 2. The Complaint appears to allege that Plaintiff McGraw-Hill Global Education Holdings, LLC is the copyright owner of "Strategic Management: Concepts, 3rd ed." ECF No. 7-1 at 2. Publicly available Copyright Office records state otherwise. These records list entity "McGraw-Hill Education" as the copyright claimant for a work entitled "Strategic Management: Concepts, 3rd edition" assigned registration no. TX0008434038. *See* Bialek Decl. Ex. E.

TX0008253612 is alleged to cover the book entitled "Business in Action, 8th ed."  ECF No. 1-2 at 3.  The Complaint appears to allege that Pearson Education, Inc. is the copyright owner of "Strategic Management: Concepts, 3rd ed."  ECF No. 7-1 at 2.  Publicly available Copyright Office records list "Bovee and Thill, LLC" as the copyright claimant for the work entitled "Business in Action, 8/E" assigned registration no. TX0008253612.  *See* Bialek Decl. Ex. F.

The first essential element of a prima facie case for copyright infringement is ownership of a valid copyright. *Rosenfeld v. Saunders*, 728 F. Supp. 236, 247 (S.D.N.Y. 1990) (denying motion for preliminary injunction based upon copyright infringement when plaintiff unable to satisfy first element of copyright infringement claim). A valid registration is a prerequisite to suit in federal court.  Copyright registrations that do not identify the named Plaintiffs as the copyright claimants of the works at issue cannot support a finding of likelihood of success on the merits of a copyright infringement claim.

### d.  <u>The Balance of Hardships & Public Interest Also Dictate That a Preliminary Injunction Should Not Enter.</u>

As described above, Plaintiffs, with revenues in the hundreds of millions, have allowed certain books at issue to remain available to the public in the stream of commerce for over a year. It strains credulity to conclude that Plaintiffs will experience harm of such a quantum so as to tip the balance of hardships decidedly in their favor.

By contrast, the harm to BBI's business would be severe if it were to be prohibited from selling its existing inventory. *Dun v. Lumbermen's Credit Ass'n*, 209 U.S. 20, 23 (1908) (characterizing injunction in copyright case as "unconscionable" where degree of infringement relatively slight compared to severity of injury that would result upon issuance of injunction).  BBI operates in a small warehouse.  Books it purchases are filtered and a majority of the books are sent to recycling plants.  The inability to dispose of books that were not going to be sold is causing a

15

back-up in the warehouse and is limiting BBI's ability to acquire new books to be sold. *See* Grooms Decl. ¶27.   Additionally, if all of BBI's accounts are frozen, as requested, it would be unable to pay operating expenses, employees' wages, or to purchase books. The hardship that such an injunction would impose would be extreme, and could result in BBI going out of business. In contrast, Plaintiffs have not identified any concrete, non-conclusory harm that would result if the requested injunction does not issue against BBI.

Considering the balance of the hardships between Plaintiffs and BBI, it is clear that a preliminary injunction would work greater hardship on BBI than the denial would on Plaintiffs. Plaintiffs are, by their own admission, some of the largest and most well-known academic publishers in the United States. The inadvertent sale of six allegedly counterfeit books by BBI, a small book reseller that sells ninety percent of its stock in bulk for recycling, has not resulted in any great or irremediable harm to them. Likewise, Plaintiffs have not shown that if no injunction issues, the alleged harms will continue, i.e., there will be further sales of counterfeit books.   No titles at issue remain in BBI's inventory. Grooms Decl. ¶22.   BBI is a small, family run business with a handful of employees will suffer enormous hardship if the requested preliminary injunction issues, as it will be completely prevented from doing business.

Finally, the public interest weighs against entry of a preliminary injunction.   As another court in this district has explained in concluding the public interest would be disserved by a preliminary injunction in a copyright case concerning books:

> [T]he normal reluctance to impose a summary restraint in advance of a full and complete trial is particularly acute in a case . . . which deals with the publication of a book." Rosemont Enters., Inc. v. Random House, Inc., 366 F.2d 303, 311 (2d Cir. 1966). The Second Circuit has indicated that, before a court may "intrude into an area fraught with sensitivity because of its possible impingement upon fundamental democratic and intellectual institutions," a plaintiff must unequivocally show its entitlement to the relief sought from both a legal and factual perspective. Id. at 311; see also Belushi v. Woodward, 598 F. Supp. 36, 37-8 (D.D.C. 1984) (plaintiff's request for TRO enjoining

sale of books which included her photograph without authorization denied). In this case, defendant has persuasively argued that enjoining the sale of the textbooks at issue would be highly disruptive to the universities and colleges that have already adopted them for use in classes. See Def. Opp. at 15 (citing Declaration of Howard Weiner, dated July 21, 2011 ("Weiner Decl.")). As defendant points out, if the adopted textbooks are not available for purchase, schools would have to locate new books and revise their curricula accordingly. Id., (citing Weiner Decl., ¶6). Such an outcome would be highly disruptive to the schools, the students, the faculty, and defendant's business relationships with academic institutions.

*Psihoyos v. John Wiley & Sons, Inc.*, 2011 U.S. Dist. LEXIS 115835, at *15-17 (S.D.N.Y. Oct. 3, 2011).

The high cost of educational textbooks is well documented. *See, e.g.*, https://www.cbsnews.com/news/whats-behind-the-soaring-cost-of-college-textbooks. Book resellers, such as BBI, provide an important service to educators and students alike: a secondary market for used or surplus textbooks. Shutting down BBI's legitimate operations—particularly now at the beginning of a new school year, would negatively impact the public by removing one source of affordable used books. This would be a disservice to the public that would not be outweighed by the slight danger that a handful of infringing books might slip through BBI's rigorous inspection process.

e. **The Scope of the Injunctive Relief Sought Is Overwhelmingly Excessive.**

An injunction must be "narrowly tailored" to the particular facts of a case "to fit specific legal violations." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 47 (2d Cir. 2016). In trademark cases, "The Lanham Act demands that injunctive relief be no broader than necessary to cure the effects of the harm caused." *Sterling Drug, Inc. v. Bayer*, 14 F.3d 733, 750 (2d Cir. 1994) (finding "a near total ban on [defendant's] use of the mark [at issue] is not necessary to protect [plaintiff's] trademark). "Although a district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct, it is nonetheless the

17

essence of equity jurisdiction that a court is only empowered to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (internal quotations and citations omitted).

Plaintiffs' requested injunction is soars well beyond enjoining the allegedly infringing activity attributed to BBI, namely, the sale of five (5) allegedly infringing books bearing five (5) trademarks. *See* Compl. Ex. B, ECF No. 1-2 (referencing BBI with respect to copyright nos. 8, 21, 65, 67, and 83 only); *See* Compl. Ex. C, ECF No. 1-3 (referencing BBI with respect to five trademarks only). As detailed above, the allegations against BBI are limited in scope to three Plaintiffs, five copyrighted works, and five trademarks. No intellectual property of Plaintiffs Elsevier or Bedford is implicated.

The proposed language of the injunction (ECF No. 3 at 6) enjoining BBI from activity directly or indirectly (i) "infringing **any** copyrighted work that is owned or exclusively controlled by **any** of the Plaintiffs" (ii) "infringing **any** trademark that is owned or exclusively controlled by **any** of the Plaintiffs" (iii) manufacturing, importing, distributing…offering for sale, and/or selling counterfeit copies of "Plaintiffs' Works" or "Plaintiffs' Marks" (or enabling others to do so) is unduly overbroad and vague. It is defective because it is not by any measure "narrowly tailored" to the particular facts of the case "to fit specific legal violations" alleged. *Guthrie*, 826 F.3d at 47. Should any injunction issue, it must be limited to the five (5) copyrighted works, and five (5) trademarks, of Plaintiffs Pearson, McGraw-Hill and Cengage.

Here, Plaintiffs seek a blanket injunction to prevent BBI from infringing any copyrighted works and trademarks owned or "controlled" by any of the Plaintiffs, without sufficiently identifying the actual works and marks that are the subject of the injunction. *See e.g.* ECF No. 3 at 6 (prohibiting Defendants from infringing "any copyrighted work published under any of the

imprints identified on Exhibit _ to the Complaint" and "any trademark that is owned or exclusively controlled by any of the Plaintiffs, including the trademarks identified on Exhibit _ to the Complaint and/or associated with the Imprints…"). First, how is BBI to know the comprehensive list of works or trademarks that are owned or "exclusively controlled" by any of five different plaintiffs? Surely, they number in the hundreds, if not thousands. Second, by using the term "including" Plaintiffs indicate the trademarks identified in the exhibit to the Complaint are merely a subset of the larger universe of marks that are the subject of the desired injunction. An injunction styled in this unduly broad manner is far too vague and uncertain, and is not something BBI can reasonably be required to conform its conduct to on a going forward basis. Moreover, as the law already prohibits BBI from infringing on Plaintiffs' works and marks, it does not provide any greater protection than what the law already provides.

The requested injunction is also overbroad in that it would prohibit BBI from "directly or indirectly manufacturing, importing, distributing (including returning goods purchased from another), offering for sale, and/or selling counterfeit copies of Plaintiffs' Works, and/or Plaintiffs' Marks." ECF No. 3 at 6. Given BBI's business model, such an injunction would have the practical effect of halting most of its operation. It would not be able to buy or sell books without making a prior determination that no infringing material was included. This is simply not feasible where BBI, a rural Missouri company, purchases books in bulk from other booksellers. Likewise, the requested injunction would require BBI to retain all of its stock to the extent that the books constitute the Plaintiffs' works or bear Plaintiffs' marks, regardless of whether the works were counterfeit or genuine, until such time that Plaintiffs make their own determination as to whether the items are infringing. This, despite the fact that approximately ninety percent of BBI's bulk stock is destined for destruction in any event.

9267484v.1

Likewise, to the extent the Plaintiffs request an order preventing BBI from "transferring, withdrawing, or otherwise disposing of any money or other assets in Defendants' Accounts," *see* ECF No. 3 at 7, the scope of the requested relief is not proportional to the Plaintiffs' alleged harm, and would prevent BBI from carrying on its business. Where only ten percent of BBI's sales are retail sales, and—as shown by Plaintiffs' Exhibit B—only a nominal portion of its sales are allegedly counterfeit, it would be severely disproportionate and punitive to freeze all of its assets. Plaintiffs have identified six sales of used books by BBI. *See* Compl. Ex. B, ECF No. 1-2 (referencing BBI with respect to copyright nos. 8, 21, 65, 67, and 83 only). The "revenues" on such sales are likely less than the plaintiffs earn in one second (24 hour, weekends and holidays included). Certainly shutting down a business due to a lost second of revenues is disproportionate. Moreover, Plaintiffs have made no showing that, as to BBI, such relief would be warranted. *See, e.g. Asia TV USA, Ltd. v. Total Cable USA LLC*, No. 16-cv-6873 (AJN), 2018 U.S. Dist. LEXIS 54026, at *26-27 (S.D.N.Y. Mar. 29, 2018) (denying Plaintiffs' request for an injunction prohibiting "Defendants from, inter alia, withdrawing, transferring, or disposing of any assets or property").

As discussed above, BBI is a legitimate family business employing several full time employees at its location in Missouri. It is not, as Plaintiffs' conclusory allegations imply, a fly-by-night shell corporation, operating in the shadows. BBI has a significant interest in ensuring that its day to day operations are able to continue; it pays the salaries of its principals, for whom it is their primary income.

### f.   <u>Plaintiffs Must Post a Bond if a Preliminary Injunction is Entered.</u>

Rule 65(c) of the Federal Rules of Civil Procedure mandates that a party obtaining a

9267484v.1

preliminary injunction post a bond "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *Little Tor Auto Ctr. v. Exxon Co. USA*, 822 F. Supp. 141, 144 (S.D.N.Y. 1993) ("The injunction bond insures that funds will be available to compensate a party improvidently enjoined at the behest of the party posting the bond.").

As set forth above, the harm to BBI from a preliminary injunction would be significant. Therefore, should the Court determine issuance of an injunction is warranted despite the deficiencies in Plaintiffs' four-pronged showing required for such relief, BBI respectfully requests leave to make additional submissions regarding the appropriate amount for such a bond.

## III.    CONCLUSION

For the reasons set forth above, BBI respectfully requests that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated:  September 5, 2018
        New York, New York

                                    Respectfully Submitted,

                                    **WILSON, ELSER, MOSKOWITZ,
                                    EDELMAN & DICKER LLP**

                                    By: _____
                                    Adam R. Bialek
                                    Kerianne Losier
                                    150 East 42nd Street
                                    New York, NY 10017
                                    Telephone: (212) 490-3000
                                    Facsimile: (212) 490-3038
                                    Adam.Bialek@wilsonelser.com
                                    Kerianne.Losier@wilsonelser.com

                                    *Attorneys for Defendant Borgasorus Books, Inc.*