# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEARSON EDUCATION, INC.; CENGAGE LEARNING, INC.; ELSEVIER INC.; MCGRAW-HILL GLOBAL EDUCATION HOLDINGS, LLC; and BEDFORD, FREEMAN & WORTH PUBLISHING GROUP, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> BRADLEY YOUNG; JOHN MONIZ; KRISTA HALE; DERVIS OZAY; MUHAMMET MUTLU; BIZZARE CRAFTS PVT. LTD.; PRADEEP KUMAR SAHNI; DIWAKAR KUMAR; ABHISHEK KUMAR SINGH; IRSHAD AHMED; SUSHIL KUMAR SHARMA; NIYA WOOD; EYAD ALSUHAIBANI; ALAN MURRAY; GILSON JOSE GONCALVES FILHO; ANTHEM, LLC; TRACY W. JERNIGAN; BORGASORUS BOOKS, INC.; FLIPPING PAGES INC.; BENJAMIN BARRETT ROBERTS; CAMERON WESLEY ROBERTS; SPENCER J. ROWLES; WESLEY ROWLES; CARLOS A. CORRASCO; ROBERT D. MEADOWS; and UNITYSTORE INC., <br><br> Defendants. | **Civil Action No. 18-CV-7380-PGG** <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> 1. **COPYRIGHT INFRINGEMENT (17 U.S.C. § 101, *et seq.*); and** <br> 2. **TRADEMARK COUNTERFEITING (15 U.S.C. § 1114).** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Pearson Education, Inc., Cengage Learning, Inc., Elsevier Inc., McGraw-Hill Global Education Holdings, LLC, and Bedford, Freeman & Worth Publishing Group, LLC (hereinafter, collectively "Plaintiffs," and each a "Plaintiff"), by and through their undersigned counsel, hereby allege as follows for their Complaint against Defendants Bradley Young; John Moniz; Krista Hale; Dervis Ozay; Muhammet Mutlu; Bizzare Crafts Pvt. Ltd.; Pradeep Kumar Sahni; Diwakar Kumar; Abhishek Kumar Singh; Irshad Ahmed; Sushil Kumar Sharma; Niya Wood; Eyad Alsuhaibani; Alan Murray; Gilson Jose Goncalves Filho; Anthem, LLC; Tracy W. Jernigan; Borgasorus Books, Inc.; Flipping Pages Inc.; Benjamin Barrett Roberts; Cameron

Wesley Roberts; Spencer J. Rowles; Wesley Rowles; Carlos A. Corrasco; Robert D. Meadows; and UnityStore Inc. (hereinafter, collectively "Defendants," and each a "Defendant"):

## NATURE OF THE CASE

1.      This case arises out of extensive violations of the federal copyright and trademark laws.  Defendants are intentionally advertising, selling, and distributing counterfeit textbooks at the expense of authors, students, publishers, and others.

2.      Plaintiffs are five of the leading educational publishers in the United States.  They provide a comprehensive range of traditional physical and digital educational content to teachers, professionals, and secondary, post-secondary, and graduate-level students.

3.      Defendants are merchants who conduct business in the United States by means of at least 31 online storefronts (the "Online Storefronts" or "Storefronts") primarily on Amazon.com, as well as on Abebooks.com, Alibris.com, and Valore.com (collectively, the "Online Marketplaces").  All Defendants sell and distribute counterfeit textbooks on Amazon or Abebooks, and some also sell and distribute counterfeit textbooks on other Online Marketplaces. Through their Online Storefronts, Defendants sell counterfeit textbooks that infringe Plaintiffs' copyrights and bear unauthorized reproductions of Plaintiffs' federally registered trademarks. Defendants sell the infringing textbooks to individual consumers, wholesale distributors, and other re-sellers.

4.      Plaintiffs sell their textbooks through various wholesale and retail channels.  Sales of Plaintiffs' textbooks on the Online Marketplaces—whether by wholesalers or individual resellers—represent an important distribution channel for students looking to purchase Plaintiffs' textbooks.  Defendants advertise, offer, and sell their counterfeit textbooks on the Online Marketplaces to the same students and other consumers seeking out legitimate copies of Plaintiffs' textbooks.  Defendants identify the textbooks using the legitimate textbooks' respective titles,

editions, authors, ISBN (International Standard Book Number), and cover images bearing Plaintiffs' trademarks. Defendants often sell their counterfeit copies well below market prices for the authentic books. In so doing, Defendants undercut sales and the perceived value of authorized and legitimate copies of Plaintiffs' textbooks.

5. Plaintiffs bring this Complaint for damages and injunctive relief to stop and to seek redress for Defendants' infringement of Plaintiffs' intellectual property rights.

## PARTIES

6. Plaintiff Bedford, Freeman & Worth Publishing Group, LLC ("Macmillan Learning") is a New York limited liability company with a principal place of business at One New York Plaza, New York, New York 10004, and is wholly owned by Macmillan Holdings, LLC, also a New York limited liability company.

7. Plaintiff Cengage Learning, Inc., formerly Thomson Learning Inc. ("Cengage"), is a Delaware corporation with offices located in New York.

8. Plaintiff Elsevier Inc. ("Elsevier"), is a Delaware corporation with a principal place of business at 230 Park Avenue, New York, New York 10169.

9. Plaintiff McGraw-Hill Global Education Holdings, LLC ("MHE") is a Delaware limited liability company with a principal place of business at 2 Penn Plaza, New York, New York 10020.

10. Plaintiff Pearson Education, Inc. ("Pearson"), is a Delaware corporation with offices located in New York.

11. Upon information and belief, Defendant Bradley Young is an individual who resides in Humboldt, Tennessee and operates the Online Storefronts "Anything You Can Imagine" on Amazon.com and "affordabletextbooks" on eBay.com.

12. Upon information and belief, Defendant John Moniz is an individual who resides

in Chesapeake, Virginia and operates the Online Storefronts "Booksabillions" and "Momma's Media 'N More" on Amazon.com.

13.     Upon information and belief, Defendant Krista Hale is an individual who resides in Chesapeake, Virginia and operates the Online Storefronts "Booksabillions" and "Momma's Media 'N More" on Amazon.com.

14.     Upon information and belief, Defendant Muhammet Mutlu is an individual who resides in Arlington, Texas and operates the Online Storefronts "Books Worm, Inc." and "Shelf Book" on Amazon.com.

15.     Upon information and belief, Defendant Dervis Ozay is an individual who resides in Arlington, Texas and operates the Online Storefronts "Books Worm, Inc." and "Shelf Book" on Amazon.com.

16.     Upon information and belief, Defendant Bizzare Crafts Pvt. Ltd. ("Bizzare Crafts") is an Indian corporation with its principal place of business located in Darbhanga, India.  Upon information and belief, Bizzare Crafts operates the Online Storefronts "Clingonbling," "Gift_Fair," and "Online mySolutions" on Amazon.com.

17.     Upon information and belief, Defendant Diwakar Kumar is an individual who resides in India and operates the Online Storefronts "Clingonbling," "Gift_Fair," and "Online mySolutions" on Amazon.com.  Diwakar Kumar is a Director of Bizzare Crafts.

18.     Upon information and belief, Defendant Pradeep Kumar Sahni is an individual who resides in India and operates the Online Storefronts "Clingonbling," "Gift_Fair," and "Online mySolutions" on Amazon.com.  Defendant Sahni also does business as and/or uses the alias "Book N Beyond."

19.     Upon information and belief, Defendant Abhishek Kumar Singh is an individual

who resides in India and operates the Online Storefronts "Clingonbling," "Gift_Fair," and "Online mySolutions" on Amazon.com.

20.     Upon information and belief, Defendant Irshad Ahmed is an individual who resides in India and operates the Online Storefronts "Clingonbling," "Gift_Fair," and "Online mySolutions" on Amazon.com.

21.     Upon information and belief, Defendant Sushil Kumar Sharma is an individual who resides in India and operates the Online Storefronts "Clingonbling," "Gift_Fair," and "Online mySolutions" on Amazon.com.

22.     Upon information and belief, Defendant Niya Wood is an individual who resides in Stone Mountain, Georgia and operates the Online Storefront "Cpmom" on Amazon.com.

23.     Upon information and belief, Defendant Eyad Alsuhaibani is an individual who resides in Arlington, Texas and operates the Online Storefront "ERA-Bookstore" on Amazon.com.

24.     Upon information and belief, Defendant Alan Murray is an individual who resides in Florida and operates the Online Storefront "Murray Media" on Abebooks.com.

25.     Upon information and belief, Defendant Gilson Jose Goncalves Filho is an individual who resides in Gurupi, Brazil and operates the Online Storefront "Prime Box up" on Amazon.com.

26.     Upon information and belief, Defendant Anthem, LLC ("Anthem") is a South Carolina corporation. Anthem's articles of organization filed with the South Carolina Secretary of State identify its designated office as located at 1015 Charlotte Avenue, Suite 335, Rock Hill, South Carolina 29732, which is the address of a UPS Store. Anthem operates the Online Storefront "Info Avenue" on Amazon.com.

27.     Upon information and belief, Defendant Tracy W. Jernigan is an individual who

resides in York, South Carolina and operates the Online Storefront "Info Avenue" on Amazon.com. Defendant Jernigan is the Member and Manager of Defendant Anthem.

28. Upon information and belief, Defendant Borgasorus Books, Inc. ("Borgasorus") is a Missouri corporation with its principal place of business located at 302A East 1st Street South, Wright City, Missouri, 63390. Borgasorus operates the Online Storefronts "Borgasorus Books, Inc" on Abebooks.com, "Borgasorus Books, Inc" on Alibris.com, and "borgasorus" on Valore.com.

29. Upon information and belief, Defendant Flipping Pages Inc. is a Virginia corporation with its principal place of business located at 5461 Brickshire Drive, Providence Forge, Virginia 23140. Flipping Pages Inc. operates the Online Storefront "FlippingPages" on Amazon.com.

30. Upon information and belief, Defendant Benjamin Barrett Roberts is an individual who resides in Providence Forge, Virginia and operates the Online Storefront "FlippingPages" on Amazon.com with his brother, Defendant Cameron Roberts. Upon information and belief, Benjamin Roberts is a Director and principal of Defendant Flipping Pages, Inc.

31. Upon information and belief, Defendant Cameron Wesley Roberts is an individual who resides in Providence Forge, Virginia and operates the Online Storefront "FlippingPages" on Amazon.com with his brother, Defendant Benjamin Roberts. Upon information and belief, Cameron Roberts is a Director and principal of Defendant Flipping Pages, Inc.

32. Upon information and belief, Defendant Spencer J. Rowles is an individual who resides in Carlsbad, California and operates the Online Storefronts "Rowlix" and "The College Book Center" on Amazon.com.

33. Upon information and belief, Defendant Wesley Rowles is an individual who

resides in Vista, California and operates the Online Storefront "The College Book Center" on Amazon.com with his brother Defendant Spencer Rowles.

34.     Upon information and belief, Defendant Carlos A. Corrasco is an individual who resides in Carlsbad, California and operates the Online Storefront "Kapital Enterprise" on Amazon.com.

35.     Upon information and belief, Defendant Robert D. Meadows is an individual who resides in Fort Myers, Florida and operates the Online Storefront "SwodieBooks" on Amazon.com.

36.     Upon information and belief, Defendant UnityStore Inc. is a New York corporation with its principal place of business located at 10211 Larue Avenue, No. 2F, Corona, NY 11368. Upon information and belief, UnityStore Inc. operates the Online Storefront "UnityStore" on Amazon.com.

## JURISDICTION AND VENUE

37.     This is a civil action arising under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*  As such, the Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and 15 U.S.C. § 1121.

38.     The Court has personal jurisdiction over Defendants pursuant to N.Y. C.P.L.R. § 302 because, upon information and belief, Defendants transact business in New York, and committed tortious acts within and/or causing injury to Plaintiffs in New York, and Plaintiffs' claims arise from those activities.  In particular, upon information and belief, Defendants (a) transact business in New York by selling and shipping textbooks to customers in New York, (b) have committed acts of copyright and trademark infringement and counterfeiting in New York and in this District, and/or (c) have committed acts of copyright and trademark infringement and counterfeiting outside New York causing injury to Plaintiffs in New York, and Defendants expected or should reasonably have expected such acts to have consequences in New York, and

Defendants derive substantial revenue from interstate or international commerce. In addition, Defendants sell textbooks, including counterfeit copies of Plaintiffs' copyrighted textbooks bearing Plaintiffs' trademarks, through online storefronts on highly interactive websites, such as Amazon.com, which are continuously accessible to, target, sell, and ship goods to consumers in New York.

39.    The Court also has general personal jurisdiction over Defendant UnityStore Inc. under N.Y. C.P.L.R. § 301 because it is a New York corporation.

40.    The Court has jurisdiction, in the alternative, over Defendants Bizzare Crafts Pvt. Ltd., Pradeep Kumar Sahni, Diwakar Kumar, Abhishek Kumar Singh, Irshad Ahmed, Sushil Kumar Sharma, and Gilson Jose Goncalves Filho under Federal Rule of Civil Procedure 4(k).

41.    Venue is proper, *inter alia*, pursuant to 28 U.S.C. §§ 1391(b) because, upon information and belief, Defendants conduct, transact, and/or solicit business in this District.

## FACTUAL ALLEGATIONS

### A.    Plaintiffs' Businesses

42.    Plaintiffs are among the largest providers of textbooks and tailored learning solutions in the United States. In the academic marketplace, Plaintiffs serve secondary, post-secondary, and graduate-level students, teachers, and learning institutions providing quality content and assessment material in physical, digital, and multi-media formats. Plaintiffs' publications include physical textbooks. These textbooks are widely available in the marketplace for sale or rental, including from physical and online bookstores. Plaintiffs' products are sold throughout the United States and in many other countries, through direct sales channels and via a network of distributors.

43.    Plaintiffs publish their works under many imprints, or brands, that are well known and highly respected. For example, Cengage's imprints include Brooks/Cole, Delmar, Heinle, and

South-Western Educational Publishing; Elsevier's imprints include Academic Press, Butterworth Heinemann, Mosby, and Saunders; MHE's imprints include Irwin, Lange, and McGraw-Hill Higher Education; Pearson's imprints include Addison Wesley, Allyn & Bacon, Benjamin Cummings, and Prentice Hall; Macmillan Learnings' imprints include Bedford/St. Martin's, W.H. Freeman & Company, and Worth Publishers. These are just some of Plaintiffs' many valuable and recognizable imprints. Exhibit A includes a complete list of Plaintiffs' imprints for purposes of their claims against Defendants (the "Imprints").

44.     Plaintiffs invest significant time and money into publishing their textbooks. Plaintiffs (and/or their predecessors) have invested decades of effort in building a reputation of quality in the publishing industry, which consumers associate with Plaintiffs and their trademarks. Plaintiffs spend significant resources annually in the advertisement and promotion of their goods in the United States under their respective marks. Plaintiffs' Marks and the goodwill of the business associated with them in the United States are of tremendous value and have become associated in the public mind with each Plaintiff's reputation for publishing textbooks of the very highest quality.

45.     Plaintiffs suffer serious financial and reputational injury when their copyrights and trademarks are infringed. Both publishers and authors alike are deprived of income when their textbooks are unlawfully copied and sold, or when their copyrights are otherwise infringed, which can have serious financial and creative repercussions for them and their work. A substantial decline in revenue from sales or rentals of Plaintiffs' copyrighted works could cause Plaintiffs to cease publication of one or more deserving textbooks. This would have an adverse impact on the creation of new textbooks, on scholarly endeavor, as well as on the availability and quality of educational content in the humanities, sciences, and social sciences.

### B. Plaintiffs' Respective Copyright Registrations

46. Plaintiffs are the copyright owners of, and/or the owners of the exclusive rights under copyright in, *inter alia*, the works, or derivative works, described on Exhibit B (the "Authentic Works"). Plaintiffs or their affiliates have obtained copyright registrations, duly issued by the United States Copyright Office, covering their respective Authentic Works.

### C. Plaintiffs' Respective Trademark Registrations

47. Plaintiffs' Authentic Works bear trademarks as set forth on Exhibit C (hereinafter, the "Marks"), which Plaintiffs or their affiliates have duly registered on the Principal Registrar of the United States Patent and Trademark Office. Plaintiffs own or are the exclusive licensee of their respective Marks. Plaintiffs' Marks are distinctive and arbitrary, and many are now incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

### D. The Online Marketplaces

48. Amazon.com, Inc. is a global e-commerce company and is the world's largest e-commerce retailer. In addition to providing a platform for Amazon's own sales, Amazon is a marketplace for third-party sellers to advertise, offer for sale, and sell their products or goods directly to consumers. Each day, millions of consumers use Amazon's marketplace to purchase a wide range of products, including textbooks, from Amazon and third-party sellers.

49. Amazon provides third-party sellers on its platform the option of using its Fulfillment by Amazon ("FBA") service, which allows sellers to outsource warehouse, shipping, and customer service operations to Amazon in exchange for additional fees. FBA sellers ship their products to one of Amazon's fulfillment centers across the country and Amazon stores, packs, ships, and handles customer service and returns for the FBA seller's goods. A buyer never interacts with an FBA seller directly unless they have an inquiry and choose to communicate with the seller, which is done anonymously through Amazon's platform.

50.     A key feature of the Amazon marketplace is that multiple sellers can offer the same product.  Each product sold on Amazon is listed on or in connection with a product detail page, which includes a product image, prices, description, customer reviews, ordering options, and links to view offers from all marketplace sellers of the product.

51.     Product detail pages for textbooks on Amazon are tied to the respective textbook's ISBN.  Accordingly, on Amazon there is a single product page[1] for each of Plaintiffs' textbooks that lists multiple sellers, including those who may be selling counterfeits.  To unsuspecting individual consumers, the offers all appear to be for legitimate copies of textbooks because they are listed under the same product page as the authentic version.  The consumer is left to choose which price they want to pay and from which seller.

52.     Customers may leave a substantive review about a product on the product detail page.  Customers may also leave a review about the buying or shipping experience or the quality of the particular product they received.  On the product page, therefore, there often are substantive reviews as well as reviews that comment on the buyer's experience with the particular seller that sold the product.  As such, someone who purchases a textbook on Amazon.com may leave a review complaining about the book's inferior quality, as is often the case with counterfeits, on the textbook's product page.  The name of the seller that supplied the counterfeit, or otherwise provided the consumer with an unsatisfactory experience, is not associated with the textbook's product page.  As a result, the overall review—and perceived value—of the author's and publisher's work deteriorates.

---

[1] While Amazon instructs its sellers to list textbooks under the existing product page identified by the textbook's unique ISBN, some sellers violate that policy by creating a different product page for a particular textbook linked to a unique ASIN (Amazon Standard Identification Number)—the number Amazon uses to identify each unique, non-book product sold on the marketplace—instead of the ISBN.

53.     Like Amazon, eBay.com is a global e-commerce platform.  The eBay online marketplace allows third-party sellers worldwide to advertise, offer for sale, and sell books, both new and used, directly to consumers.  According to its financial statements, eBay enabled $94 billion of gross merchandise volume in 2018.  eBay currently has more than 179 million active buyers and over one billion live listings globally.

54.     Abebooks.com is also a global e-commerce platform, but it specializes in the sale of books and textbooks.  Abebooks is a wholly owned subsidiary of Amazon.  The Abebooks online marketplace allows third-party sellers worldwide to advertise, offer for sale, and sell books, both new and used, directly to consumers.

55.     The eBay and Abebooks sites have expansive search functions giving consumers the ability to search for books by any combination of ISBN, title, author, and a number of other criteria.  Thus, with just a few keystrokes, consumers can see a list of sellers offering a particular textbook title.  Each, or nearly each, listing for the title displays a stock image of the cover of the book, whether the book offered for sale is new or used, and, if used, the condition of the book.  To unsuspecting individual consumers, the listings all appear to be for legitimate copies of textbooks because they are listed with the same cover image, ISBN, edition, author, and publisher.  The consumer is left to select the book they want to purchase, which all too often is based solely or largely on the price offered.

56.     When a seller receives an order through their online storefront on eBay or Abebooks, the seller ships the purchased item directly to the customer.  eBay sellers choose the payment methods their storefront will accept, e.g., PayPal or eBay checkout.  For Abebooks sellers, Abebooks processes the ensuing payments, and then distributes the sales proceeds to sellers on a regular, automated schedule to the financial institution accounts registered to the respective

Abebooks seller account.

57.    The Alibris.com and Valore.com online marketplaces platforms operate similarly to Abebooks.com.  Unlike Valore and Abebooks, merchants on Alibris can sell music, film, and TV programs in addition to books.  All three marketplaces have separate pages dedicated to textbooks.

### E.    The Pernicious Counterfeiting Problem

58.    Textbook counterfeiting is rampant, particularly as a result of the ease by which counterfeiters across the world can sell counterfeit textbooks to U.S. consumers via the many well-known online marketplace platforms.

59.    Counterfeit textbooks are often printed overseas and imported into the lucrative U.S. market.  The counterfeit books are of varying levels of quality; while some appear to be high quality, many others are not, with inferior bindings, printing, or other problems.

60.    While some consumers never know they have purchased a counterfeit textbook, others learn the book is counterfeit after the book's binding starts falling apart, or pages begin falling out.  Many other consumers do not realize that the poor-quality book they received is the work of counterfeiters, and instead think the publishers' textbooks are low quality.

61.    Counterfeiters often expend significant effort to conceal their identities and often use multiple or fictitious names and addresses to register and operate what has become a massive network of online storefronts.  Nonetheless, there are often similarities among the storefronts.  The counterfeit books may also share similar indicia of being counterfeit, which suggests that the counterfeit books were printed by and come from a common source.

62.    In addition to operating under multiple fictitious names, counterfeiters use a variety of other tactics to evade discovery and continue their lucrative, illicit business.  For example, once a counterfeiter receives notice of a lawsuit, he or she will often create new online marketplace

accounts on Amazon or other sites using new aliases and/or email addresses. Further, counterfeiters often use multiple credit card merchant accounts or other payment processing accounts (such as with PayPal or Payoneer) so that they can nimbly switch between accounts to evade detection and secure their illicit proceeds. It is common for counterfeit sellers to maintain off-shore bank accounts outside the jurisdiction of the Court, into which they often move the proceeds of their illegal sales.

63.     Another way for counterfeiters to operate under the radar is to sell counterfeit textbooks as used—often described as in "very good" or "like new" condition—despite the books being brand new, albeit unauthorized, copies. Listing new counterfeit textbooks in "used" condition ostensibly justifies the offer of a new current-edition textbook at a significant savings. The purportedly "used" condition also can explain why a counterfeit does not include a digital access card, which publishers often include with and as a supplement to legitimate copies of their textbooks.

64.     Plaintiffs actively enforce their copyrights and trademarks. They have and continue to expend great effort combatting textbook counterfeiting worldwide. Plaintiffs also go to great lengths to educate distributors about the counterfeiting problem in the textbook industry. In particular, Plaintiffs have worked with many distributors to create and adopt "Best Practices" to avoid sourcing counterfeit textbooks.

### F.     Defendants and their Unlawful Activities

65.     Through their enforcement efforts, Plaintiffs have confirmed that Defendants sell unauthorized and illegal counterfeit textbooks, including Plaintiffs' Authentic Works, on multiple Online Marketplaces. Plaintiffs have made purchases from Defendants' Online Storefronts, as described on Exhibit B, which confirm that Defendants distribute counterfeit copies of Plaintiffs' Authentic Works bearing Plaintiffs' Marks (hereinafter, collectively, "Counterfeit Books," and

each a "Counterfeit Book").

66.     Upon information and belief, through their Online Storefronts, Defendants target and ship their infringing textbooks to customers located in the United States, including New York. In fact, Amazon has confirmed that each of the Online Storefronts operating on Amazon.com or Abebooks.com have sold copies of Plaintiffs' textbooks to customers in New York.

67.     While Plaintiffs have identified some of the Counterfeit Books that Defendants have distributed, Plaintiffs have not identified all of them.  There are 111 unique titles (Authentic Works) in the list of Counterfeit Books on Exhibit B.  Exhibit B describes the Counterfeit Books Plaintiffs purchased from Defendants, but these are just examples of the counterfeit textbooks that Defendants are believed to have introduced into the market.  Exhibit C identifies 9 Marks on that Defendants are infringing.  The Marks on Exhibit C represent the Marks on the Counterfeit Books that Plaintiffs purchased from Defendants and are just examples of the counterfeit Marks that Defendants are believed to have introduced into the market.  Moreover, the number of textbook titles Defendants have infringed is not the same as the number of counterfeit copies Plaintiffs received from Defendants' Online Storefronts.  Plaintiffs purchased and received multiple counterfeit copies of individual textbook titles from many of Defendants' Online Storefronts.

68.     Plaintiffs' discovery of Defendants' counterfeiting activities has been challenging and time-consuming.  Infringing activity typically takes place behind closed doors.  The Defendants here hide behind the anonymity of their Storefronts.  Customers receive little to no information on the Online Marketplaces identifying the sellers behind the Storefronts.

69.     Prior to initiating this lawsuit, Plaintiffs provided notice to Amazon of the Counterfeit Books they purchased from Defendants' Amazon and Abebooks Online Storefronts. In response, Amazon provided contact information associated with Defendants' Amazon and

Abebooks accounts for each of the Storefronts. However, the contact information in Amazon's account records is only as good as the information the sellers choose to provide when registering their accounts. As Plaintiffs have discovered through prior enforcement efforts, counterfeiters often provide Amazon with fictitious names or addresses, as many Defendants did here. Sellers need only have a valid bank account number to receive their sales proceeds and/or a valid credit card number to pay fees for selling on the marketplace. For these reasons, Plaintiffs were initially unable to verify the identities and addresses of several Defendants despite Amazon's assistance in providing certain account registration information.

70. Several Defendants operate their Online Storefronts as "FBA sellers," i.e., Defendants ship their textbooks to one of Amazon's fulfillment centers, and Amazon fulfills Defendants' orders on their behalf. Accordingly, the return addresses on packages received from FBA sellers identifies one of Amazon's fulfillment centers. Other Defendants fulfill some or all of their own orders by shipping or arranging to have a third party ship books directly to customers. Even then, the return address often conceals the seller's true identity and address. Nonetheless, Plaintiffs learned that several Online Storefronts are operated by the same Defendant or group of Defendants because the return address—be it legitimate or not—on packages received from ostensibly unrelated Online Storefronts was the same address.

71. Several Defendants or groups of Defendants operate more than one Online Storefront, whether on the same or different Online Marketplaces. These Defendants, and probably others, are likely operating still other Online Storefronts, potentially on other e-commerce platforms, which Plaintiffs have not discovered yet. The Counterfeit Books Defendants distribute are different from and/or inferior to Plaintiffs' Authentic Works. For example, the Counterfeit Books' binding, glue, paper, color and printing, among other traits, are different and inferior.

Based on the use of Plaintiffs' Marks, actual and prospective purchasers are likely to believe that the Counterfeit Books are authorized and legitimate copies of Plaintiffs' Authentic Works. The Counterfeit Books' inferior quality weakens, blurs, and tarnishes Plaintiffs' respective trademarks. Plaintiffs' business reputations are further injured by having their trademarks and goodwill confused or mistakenly associated with a group or series of textbooks of lesser quality, as alleged above.

72.     Upon information and belief, Defendants intentionally purchase counterfeit copies of Plaintiffs' Authentic Works at a materially cheaper price than they would be required to pay had they purchased Plaintiffs' Authentic Works directly from the respective publishers or from legitimate third-party sellers, pursuant to the custom and practice of the bookselling industry. In doing so, Defendants deliberately evade legitimate sources, instead sourcing illegal and counterfeit copies of Plaintiffs' Authentic Works, in violation of Plaintiffs' intellectual property rights. Defendants then distribute the Counterfeit Books directly to individual consumers or other resellers on the Online Marketplaces.

73.     Defendants know or should know that the Counterfeit Books they distribute are infringing, including based on their "too good to be true price" and inferior quality, that they were listed as used, but in "very good" or "like new" condition, despite being in brand-new condition, and reviews from customers complaining that they received what appears to be a counterfeit textbook, some even going so far as to note the poor quality of the book they received. Accordingly, Defendants knowingly direct, supervise, and control the distribution of the Counterfeit Books, and have a direct financial interest in, and stand to gain a direct financial benefit from, their deliberately infringing activity. By engaging in the illegal conduct alleged above, in addition to directly organizing and effectuating such infringing activities, Defendants also

personally induce, cause, and materially contribute to infringing conduct by others, including resellers to whom Defendants likely sell the Counterfeit Books. Such resellers then further distribute the Counterfeit Books.

74. Defendants' intentional and deceitful misconduct has likely resulted in lost profits to Plaintiffs and has damaged the inherent value of Plaintiffs' Authentic Works and Marks, impaired Plaintiffs' reputations for providing high-quality higher education textbooks, diluted Plaintiffs' brands and the goodwill associated with them, all of which negatively affects Plaintiffs' relationships with distributors, authors, professors and other teachers, and students.

### a) **Defendant Bradley Young**

75. Plaintiffs purchased counterfeit copies of six different Authentic Works from Defendant Young's Online Storefront, Anything You Can Imagine.

76. Identifying and locating Young was very difficult. The return address on packages Plaintiffs received from Anything You Can Imagine identified an entity, American Expedited Wholesale Inc., which has been dissolved. The return information also identified an address in Memphis, Tennessee that is associated with co-working and virtual office space operated by Regus PLC. Amazon's account registration information identifies both Young and the dissolved corporation and the virtual office space in Memphis. Plaintiffs were unable to locate a Bradley Young in Memphis. Moreover, the bank account linked to the Online Storefront was not in Bradley's name but in that of a third-party payment-financing company that Bradley retained. However, through expedited discovery, Plaintiffs determined that Young receives sales proceeds from Anything You Can Imagine.

77. Upon information and belief, based on Young's bank account statements, Young operates and receives sales proceeds from online storefronts on eBay, Alibris.com, and eCampus.com. After discovering Young's true address, Plaintiffs searched their purchase records

and identified five Counterfeit Books previously purchased from the Online Storefront affordabletextbooks, which were shipped from Young's address in Humboldt, Tennessee. While Young directed returns to his real address, he used a fake name, "James Yelverton," in the return information.

78. Despite having actual notice of this lawsuit and having his Amazon seller account frozen, Young has not responded to Plaintiffs or otherwise appeared in the action. Accordingly, Plaintiffs have not been able to identify Young's Storefronts on Alibris and eCampus or inspect any of his inventory of Plaintiffs' textbooks.

**b)** **Defendants John Moniz and Krista Hale**

79. Upon information and belief, Defendants Hale and Moniz jointly operate the Online Storefronts Booksabillions and Momma's Media 'N More ("Momma's Media") on Amazon.com from a single location, their residence.

80. Plaintiffs purchased counterfeit copies of five different Authentic Works from Defendants Moniz and Hale's Online Storefront Booksabillions. After Plaintiffs notified Amazon of the counterfeits from Booksabillions, Amazon identified the Online Storefront Momma's Media as related to Booksabillions and disclosed limited account registration information for the Booksabillions and Momma's Media accounts. Amazon identified both Hale and Moniz as names associated with the Booksabillions account. Upon information and belief, Ms. Hale's name is associated with one of the bank accounts or credit cards that are linked to the Booksabillions account for purposes of payment. Hale was also identified by Amazon as the registrant for the related Storefront, Momma's Media, but with a different address—in Chesapeake, Virginia. After receiving this information, Plaintiffs confirmed that the return address on the counterfeit textbooks Plaintiffs purchased from Booksabillions was the very same address in Chesapeake, Virginia listed for Hale in the Momma's Media account information. Upon information and belief, the Momma's

Media Storefront also sells copies of Plaintiffs' textbooks.

81. Upon information and belief, Hale and Moniz transfer money between their respective bank accounts, which are linked to and receive sales proceeds from their Online Storefronts.

82. Plaintiffs have received 416 textbooks from Moniz and Hale's inventory for inspection pursuant to the Court's Expedited Discovery Order. The inventory was sent to Plaintiffs without making any distinction between inventory held by, and sent on behalf of, Booksabillions versus Momma's Media. Instead, all inventory, including inventory purportedly belonging to Momma's Media, was shipped in packages identifying only Booksabillions. To date, Plaintiffs have determined that 75 of the textbooks inspected are counterfeit.

83. Upon information and belief, Moniz and Hale acquired at least some of their Counterfeit Books from Defendants Flipping Pages, Inc. and Benjamin and Cameron Roberts.

c) **Defendants Dervis Ozay and Muhammet Mutlu**

84. Upon information and belief, Defendants Ozay and Mutlu jointly operate the Online Storefronts Books Worm, Inc. and Shelf Book on Amazon.com. Based on information provided to Plaintiffs by Mutlu and Ozay, they share the sales proceeds from Books Worm, Inc.

85. Plaintiffs purchased counterfeit copies of eleven different Authentic Works from Books Worm, Inc. After Plaintiffs notified Amazon of the counterfeits from Books Worm, Inc., Amazon disclosed that Mutlu is the registrant of Books Worm, Inc. The address Mutlu provided to Amazon when registering Books Worm, Inc. in "Arlington, New York" does not exist. Amazon also identified the Storefront Shelf Book as related to Books Worm, Inc.

86. Upon information and belief, Ozay is selling Counterfeit Books through other marketplaces or sites and Defendant Alsuhaibani purchased Counterfeit Books from Ozay. In addition, upon information and belief, the Counterfeit Books that Plaintiffs purchased from

Defendants Alsuhaibani, Ozay, and Mutlu all came from the same source.

87.     Plaintiffs have received five textbooks from Ozay and Mutlu's inventory for inspection pursuant to the Court's Expedited Discovery Order.  To date, Plaintiffs have determined that four of the five textbooks inspected are counterfeit.

### d)     Defendants Bizzare Crafts, Pradeep Kumar Sahni, Diwakar Kumar, Abhishek Kumar Singh, Irshad Ahmed, and Sushil Kumar Sharma

88.     Upon information and belief, Defendants Bizzare Crafts, Pradeep Kumar Sahni, Diwakar Kumar, Abhishek Kumar Singh, Irshad Ahmed, and Sushil Kumar Sharma (collectively, the "Bizzare Crafts Defendants") jointly operate the Online Storefronts, Gift_Fair, Clingonbling, and Online mySolutions from India.

89.     Plaintiffs purchased counterfeit copies of 19 different Authentic Works (21 Counterfeit Books in total) from the Bizzare Crafts Defendants' Online Storefronts.  After Plaintiffs notified Amazon of the counterfeits from Gift_Fair, Clingonbling, and Online mySolutions, Amazon disclosed account registration information for the Storefronts.  Defendants Bizzare Crafts, Kumar, and Singh, along with addresses in India and Redlands, California, are identified in Amazon's account records for Gift_Fair.  Defendant Sahni is identified in Amazon's account records for Clingonbling, along with the same address—down to suite number—in Redlands, California[2] identified in the Gift_Fair records.  Defendants Ahmed and Sharma are identified in Amazon's account records for Online mySolutions.  Based on return information, Counterfeit Books Plaintiffs purchased from Clingonbling and Online mySolutions were both shipped by Bizzare Crafts.

90.     Upon information and belief, the Bizzare Crafts Defendants have continued selling

_____

[2] The Redlands, California address appears to be shared warehouse space used by several businesses, including Shipmonk, which provides order fulfillment services to small businesses.

Counterfeit Textbooks in violation of the Court's injunctions in this case. Since filing suit, Plaintiffs have purchased nine additional Counterfeit Books from six different Online Storefronts on Amazon.com, all of which were shipped from India by Bizzare Crafts (per the return information on the packages). The six Online Storefronts are: (1) "ZB," (2) Changing_Seasons, (3) Holy Book Store, (4) Morphy Book Store, (5) onlybooksellers, and (6) Scholar's Choice [US].

91. The Bizzare Crafts Defendants undoubtedly know that the textbooks they sell are counterfeit. Indeed, one of the customer reviews on the Gift_Fair Storefront, dated April 9, 2018, complained: "The book was very cheaply and poorly constructed. I believe it is a pirated copy." Another reviewer posted on the Clingonbling Storefront on May 8, 2018: "The item is not genuine. The book has unacceptable printing issues." Yet, the Bizzare Crafts Defendants continued selling their counterfeits, including 20 Counterfeit Books, across 18 different textbook titles, to Plaintiffs between April 13 and June 5, 2018. Moreover, the Bizzare Crafts Defendants' shipments of counterfeit textbooks from India have been seized at least once, that Plaintiffs are aware of, by U.S. Customs and Border Protection ("CBP"). CBP notified Plaintiff MHE that it seized a shipment by "Clingonbling" from India that was intended for Amazon's FBA warehouse. CBP informed MHE that the seized textbooks bear counterfeit copies of MHE's Marks.

92. Despite having actual notice of this lawsuit and having multiple Amazon seller accounts frozen, the Bizzare Crafts Defendants have not responded to Plaintiffs or otherwise appeared in this action. Nonetheless, Plaintiffs inspected at least a portion of the Bizarre Crafts Defendants' inventory of Plaintiffs' textbooks in Amazon's possession pursuant to the Court's Expedited Discovery Order. Plaintiffs received for inspection 550 textbooks from the Bizzare Crafts Defendants' inventory held by Amazon. To date, Plaintiffs have determined that 548 textbooks are counterfeit.

e)     **Defendant Niya Wood**

93.     Plaintiffs purchased seven counterfeit copies of six Authentic Works  from Defendant Wood's Online Storefront, Cpmom.

94.     After Plaintiffs notified Amazon of the counterfeits from Cpmom, Amazon disclosed account registration information.  Wood registered the Cpmom Storefront on Amazon using the name "Niya Clark" and the address for Savannah State University.  However, return information on the Counterfeit Books purchased from Wood identified the name "Wood" and an address in Atlanta, Georgia.

95.     Through expedited discovery, Plaintiffs confirmed Wood's true name and location in Stone Mountain, Georgia.

96.     Upon information and belief, Defendant Wood sells counterfeit textbooks through other marketplaces or sites.  Six different distributors turned over to Plaintiffs a total of eight textbooks they suspected to be counterfeits, all of which were sourced from Wood.  Upon information and belief, Wood sold one of these counterfeit books on October 9, 2018, after and in violation of the Court's injunctions issued in this case.

97.     Despite having actual notice of this lawsuit and having her Amazon seller account and bank account frozen, Wood has not responded to Plaintiffs or otherwise appeared in this action. Accordingly, Plaintiffs have not been able or inspect any of her inventory of Plaintiffs' textbooks.

f)     **Defendant Eyad Alsuhaibani**

98.     Plaintiffs purchased counterfeit copies of nine Authentic Works from Defendant Alsuhaibani's Online Storefront, ERA-Bookstore.

99.     After Plaintiffs notified Amazon of the counterfeits from ERA-Bookstore, Amazon disclosed the account registration information, which identified Alsuhaibani as the Storefront's registrant.

100.    Upon information and belief, Alsuhaibani purchased Counterfeit Books from Defendant Ozay and the Counterfeit Books Plaintiffs purchased from Alsuhaibani, Ozay, and Mutlu all came from the same source.

g)      **Defendant Alan Murray**

101.    Plaintiffs purchased 20 counterfeit copies of 16 Authentic Works from Defendant Murray's Online Storefront, Murray Media.

102.    After Plaintiffs notified Abebooks of the counterfeits from Murray Media, Abebooks disclosed account registration information for Murray Media, which identified Murray as the Storefront's registrant. However, the address Murray used to register the Storefront and includes in return information is a UPS store. Nonetheless, bank records confirm that Murray operates and receives the sales proceeds from Murray Media.

h)      **Defendant Gilson Jose Goncalves Filho**

103.    Plaintiffs purchased counterfeit copies of four Authentic Works from Defendant Filho's Online Storefront, Prime Box up.

104.    After Plaintiffs notified Amazon of the counterfeits from Prime Box up, Amazon disclosed account registration information for Prime Box up, which identified Filho as the Storefront's registrant.

105.    Filho undoubtedly knows the textbooks he sells are counterfeit. A customer posted a review on the Prime Box up Storefront complaining that the book they purchased "looks like a bootlegged copy. Different paper print, and quality material." Moreover, upon information and belief, Filho sourced from DHGate.com, a marketplace notorious for counterfeit goods.[3]

---

[3] 2017 OUT-OF-CYCLE REVIEW OF NOTORIOUS MARKETS, Office of the United States Trade Representative, at 13-14, (*available at* https://ustr.gov/sites/default/files/files/Press/Reports/2017%20Notorious%20Markets%20List%2

106.    Plaintiffs inspected 55 textbooks from Filho's inventory held by Amazon pursuant to the Expedited Discovery Order.  Plaintiffs determined that all 55 textbooks are counterfeit.

**i)    <u>Defendants Anthem and Tracy W. Jernigan</u>**

107.    Upon information and belief, Defendant Tracy W. Jernigan operates the Online Storefront, Info Avenue, through his alter ego, Defendant Anthem.

108.    Plaintiffs purchased four counterfeit copies of three Authentic Works from Info Avenue.  After Plaintiffs notified Amazon of the counterfeits from Info Avenue, Amazon disclosed account registration information for Info Avenue.   Upon information and belief, Jernigan registered the Info Avenue Storefront using false information.   Amazon's account records identify the registrant of Info Avenue as "Douglas Lynch" in Eugene, Oregon.   The Eugene address Jernigan gave to Amazon is actually for a winery.   Moreover, Plaintiffs could not locate any Douglas Lynch in Eugene, Oregon.

109.    Through expedited discovery, Plaintiffs determined that the bank account receiving proceeds from the sale of counterfeits on Info Avenue was in Anthem's name.   Anthem's articles of organization filed with the South Carolina Secretary of State identifies as its office an address for a UPS Store in Rock Hill, South Carolina.  Anthem's bank account records identify Jernigan as Anthem's Member and Manager.   Upon information and belief, Anthem has no legitimate business, no physical office, and no website or other online presence; rather, Jernigan set up Anthem for the purpose of selling counterfeit goods and hiding his identity.

110.    Jernigan undoubtedly knows the textbooks he sells are counterfeit. A customer posted on the Info Avenue Storefront a warning that "This company sells fake books."  Jernigan

---

01.11.18.pdf) ("[DHGate] is also reportedly a leading online marketplace for the sale and distribution of counterfeit and pirated academic textbooks, with deliveries made in small parcels or via third party sellers.").

saw the review and even posted a reply.

111.    Despite having actual notice of this lawsuit and having their Amazon seller account and bank account frozen, neither Jernigan, nor Anthem, have responded to Plaintiffs or otherwise appeared in this action.  Accordingly, Plaintiffs have not been able or inspect any of their inventory of Plaintiffs' textbooks.

**j)    Defendant Borgasorus**

112.    Plaintiffs purchased six counterfeit copies of five Authentic Works from Defendant Borgasorus' Online Storefronts, Borgasorus Books, Inc. on Abebooks.com and Alibris.com and borgasorus on Valore.com.

113.    Borgasorus has known that its textbook inventory is infected with counterfeits for quite some time.  Plaintiffs purchased a Counterfeit Book from Borgasorus' Storefront on Valore.com on July 24, 2017 and sent a notice of Borgasorus' infringement to Valore.  Upon information and belief, Valore notified Borgasorus of Plaintiffs' infringement notice.  Despite this notice, Borgasorus continued to distribute counterfeit textbooks, including five Counterfeit Books that Plaintiffs later purchased from its Storefronts.

114.    Upon information and belief, Borgasorus also sells counterfeit textbooks through other marketplaces or sites.  Two distributors turned over to Plaintiffs a total of six textbooks they suspected to be counterfeits, which were sourced from Borgasorus.

**k)    Defendants Flipping Pages, Benjamin Roberts, and Cameron Roberts**

115.    Upon information and belief, Defendants Benjamin and Cameron Roberts operate the Online Storefront, FlippingPages, as and through their closely held corporation, Defendant Flipping Pages, Inc. (collectively with Benjamin and Cameron Roberts, the "Flipping Pages Defendants")

116.    Plaintiffs purchased 20 counterfeit copies of 19 Authentic Works from the

FlippingPages Storefront on Amazon. After notifying Amazon of the counterfeits from FlippingPages, Amazon disclosed the Storefront's registration information. Flipping Pages, Inc. is listed as the Storefront's registrant, while Benjamin and Cameron Roberts are each listed as the names associated with the bank accounts receiving proceeds of the Storefront's sales. Amazon also identified the Online Storefront Shared Knowledge Literacy Foundation as related to the FlippingPages Storefront.

117. Benjamin and Cameron Roberts are directors of Flipping Pages, Inc. and Cameron Roberts serves as its President. Upon information and belief, the Flipping Pages Defendants have sold over $20 million of Plaintiffs' textbooks in the last few years.

118. Upon information and belief, The Flipping Pages Defendants source textbooks for the FlippingPages Storefront through the Amazon Trade-In Program, choose not to inspect the textbooks before selling them, and have no information about the ultimate source of the textbooks they sell.

119. Upon information and belief, the Flipping Pages Defendants also sell textbooks out of the Shared Knowledge Literacy Foundation's warehouse in Virginia. Upon information and belief, Defendants Hale and Moniz purchased Counterfeit Books in cash from the Flipping Pages Defendants at the Virginia warehouse. At least some of the Counterfeit Books Hale and Moniz purchased from the Flipping Pages Defendants had a "Flipping Pages" sticker on them.

120. The Flipping Pages Defendants have been on notice that they were selling Counterfeit Books since at least as early as June 6, 2018 after Plaintiffs sent an infringement notice to Amazon regarding FlippingPages. Upon information and belief, rather than contact Plaintiffs or implement remedial measures, the Roberts Defendants both contacted Amazon requesting that Amazon take no action against them. Instead, the Flipping Pages Defendants continued making

sales of Plaintiffs' textbooks, totaling more than \$426,000, until the temporary restraining order was served in this case.

121.    Plaintiffs have inspected 483 textbooks from the Flipping Pages Defendants' inventory pursuant to the Expedited Discovery Order.  Plaintiffs determined that at least 169 of the textbooks inspected are counterfeit.

**l)      Defendants Spencer J. Rowles, Wesley Rowles, and Carlos A. Corrasco**

122.    Upon information and belief, Defendants Spencer Rowles, Wesley Rowles, and Carlos Corrasco (the "Rowles Defendants") jointly operate the Online Storefronts Rowlix, The College Book Center, and Kapital Enterprise.

123.    Plaintiffs purchased 45 counterfeit copies of 21 Authentic Works from the Rowles Defendants' Online Storefronts.  After Plaintiffs notified Amazon of the counterfeits from Rowlix, The College Book Center, and Kapital Enterprise, Amazon disclosed that Spencer Rowles is the registrant of Rowlix, Wesley Rowles is the registrant of The College Book Center, and Carrasco is the registrant of Kapital Enterprise. Upon information and belief, Defendants Spencer and Wesley Rowles are brothers and Defendants Spencer Rowles and Corrasco are friends and roommates.

124.    Upon information and belief, the Rowles Defendants also have sold counterfeit textbooks through eBay.com, EagleSaver.com, SellBackYourBook.com, BuybackExpress.com, and Cash4Books.net, among other channels.

125.    Upon information and belief, the Rowles Defendants sourced textbooks from DHGate.com and therefore knew or should have known that the textbooks they were selling were counterfeit.[4]

---

[4] *See* footnote 3 *supra.*

126.     Plaintiffs have inspected 172 textbooks from the Rowles Defendants' inventory held by Amazon pursuant to the Expedited Discovery Order.  Plaintiffs determined that all 172 textbooks inspected are counterfeit.

**m)     Defendant Robert D. Meadows**

127.     Plaintiffs purchased counterfeit copies of ten Authentic Works from Defendant Meadows's Online Storefront, SwodieBooks.  After Plaintiffs notified Amazon of the counterfeits from SwodieBooks, Amazon disclosed registration information, which identified Meadows as the registrant of the SwodieBooks Storefront.

128.     Plaintiffs purchased a copy of *Essentials of Intentional Interviewing: Counseling in a Multicultural World*, 3rd edition, ISBN 9781305087330, which was listed in "Used-Very Good" condition, from the Online Storefront SwodieBooks on Amazon.  But, rather than receiving the legitimate textbook, Plaintiffs received what appears to be a brand-new, counterfeit copy from SwodieBooks.

129.     Plaintiffs have inspected 414 textbooks from Meadows's inventory held by Amazon pursuant to the Expedited Discovery Order.  To date, Plaintiffs have determined that 42 of the textbooks inspected are counterfeit.

**n)     Defendant UnityStore**

130.     Plaintiffs purchased counterfeit copies of nine Authentic Works from Defendant UnityStore's Online Storefront of the same name.

131.     After notifying Amazon of the counterfeits received from the UnityStore Storefront, Amazon disclosed account registration information that identified the Storefront's registrant as UnityStore Inc., a New York corporation located in Corona, New York.

## FIRST CLAIM FOR RELIEF

### Copyright Infringement Under 17 U.S.C. §§ 101, *et seq.*

132.    Plaintiffs re-allege and incorporate by reference the allegations set forth above in paragraphs 1- 131.

133.    Plaintiffs' Authentic Works constitute original works and copyrightable subject matter pursuant to the Copyright Act, and they are protected by registrations duly issued to Plaintiffs (or their predecessors or affiliates) by the United States Copyright Office.

134.    At all relevant times, Plaintiffs have been and still are the owners, or exclusive licensees, of all rights, title, and interest in and to their respective copyrights in Plaintiffs' Authentic Works, which have never been assigned, licensed, or otherwise transferred to Defendants.

135.    Beginning on an unknown date but at least since June 2017 and continuing to the present, Defendants, with knowledge of Plaintiffs' copyrights in Plaintiffs' Authentic Works, have infringed Plaintiffs' copyrights.  Specifically, Defendants infringed Plaintiffs' exclusive rights to distribute their copyrighted works.  They did so by, among other things, selling the Counterfeit Books for profit, without Plaintiffs' permission, license, or consent, in violation of 17 U.S.C. § 106.

136.    Defendants' unlawful conduct, as set forth above, was willful.  Defendants had actual and/or constructive knowledge that their conduct was unlawful and in violation of Plaintiffs' copyrights.  Defendants acted intentionally and in reckless disregard of Plaintiffs' copyrights.

137.    As a result of Defendants' unlawful and deliberate conduct as set forth above, Plaintiffs have been, and will continue to be, damaged.

138.    Defendants' actions described above have caused and will continue to cause

irreparable damage to Plaintiffs, for which Plaintiffs have no remedy at law. Unless this Court restrains Defendants from continuing their infringement of Plaintiffs' copyrights, these injuries will continue to occur in the future. Plaintiffs are accordingly entitled to injunctive relief restraining Defendants from further infringement.

**SECOND CLAIM FOR RELIEF**

**Trademark Counterfeiting Under 15 U.S.C. § 1114(1)(a)**

139.    Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1- 131.

140.    This claim, arising under Section 32 of the Lanham Act, 15 U.S.C. § 1114, is for counterfeiting of Plaintiffs' Marks. At all relevant times, Plaintiffs have been and still are the owners, or exclusive licensees, of all rights, title, and interest in and to their respective Marks, which are valid and protectable trademarks that are registered with the United States Patent and Trademark Office.

141.    Beginning on an unknown date but at least since June 2017 and continuing to the present, Defendants have infringed Plaintiffs' federally registered Marks through their use in commerce, without Plaintiffs' consent, of a counterfeit, copy, or colorable imitation of Plaintiffs' Marks, in connection with the sale, offering for sale, distribution, and/or advertising of the Counterfeit Books, and such use is likely to cause confusion, to cause mistake, and/or deceive the public.

142.    The spurious, counterfeit marks on the Counterfeit Books that Defendants have distributed are identical to and/or substantially indistinguishable from Plaintiffs' Marks that appear on Plaintiffs' Authentic Works.

143.    Defendants have acted intentionally and in reckless disregard of Plaintiffs'

trademark rights. Defendants are intentionally using Plaintiffs' Marks on unauthorized products and infringing upon Plaintiffs' trademark rights in order to further their own business enterprises.

144. Defendants' unlawful conduct, as set forth above, was willful. Defendants had actual and/or constructive knowledge that their conduct was unlawful and would cause confusion, mistake, or deception.

145. As a result of Defendants' unlawful conduct as set forth above, Plaintiffs have been, and will continue to be, damaged.

146. Defendants' counterfeiting of Plaintiffs' Marks, as described above, has caused and will continue to cause irreparable injury to Plaintiffs, including to their reputation and goodwill, for which Plaintiffs have no adequate remedy at law. Unless this Court restrains Defendants from continuing their counterfeiting activities, these injuries will continue to occur in the future. Plaintiffs are accordingly entitled to injunctive relief restraining Defendants from further counterfeiting.

## PRAYER FOR RELIEF

By reason of the acts and circumstances alleged above, Plaintiffs seek relief from this Court as follows:

1. Judgment on each of the claims set forth above, including that Defendants' infringement of Plaintiffs' Authentic Works and Marks was intentional and willful.

2. Damages and/or restitution according to proof at trial, including exemplary damages where authorized by statute;

3. An accounting and disgorgement of Defendants' profits, gains, and advantages realized from their unlawful conduct, including a reconciliation of purchases and sales of the Counterfeit Books with documents relating to all such purchases and sales;

4. An order requiring Defendants to pay Plaintiffs such damages as Plaintiffs have sustained as a consequence of Defendants' unlawful acts as alleged above, including actual damages or statutory damages, at Plaintiffs' election, pursuant to 17 U.S.C. § 504;

5. An order enjoining Defendants and those in active concert with them from further infringing upon Plaintiffs' respective copyrights pursuant to 17 U.S.C. § 502;

6. An order enjoining Defendants and those in active concert with them from further infringing upon Plaintiffs' respective trademarks pursuant to 15 U.S.C. § 1116;

7. An order requiring Defendants to pay Plaintiffs such damages as Plaintiffs have sustained as a consequence of Defendants' unlawful use of their trademarks, as alleged above, including statutory damages or treble damages, pursuant to 15 U.S.C. § 1117;

8. An order requiring Defendants to deliver up for destruction all products, packaging, labels, literature, advertising, and other material bearing imitations, including confusingly similar variations, of Plaintiffs' respective copyrights and marks pursuant to 17 U.S.C. § 503 and 15 U.S.C. § 1118;

9. Prejudgment and post-judgment interest at the applicable rate;

10. Plaintiffs' attorney's fees, expenses, and costs of suit; and

11. Such other and further relief the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs hereby request a trial by jury.

DATED:  May 2, 2019                              Respectfully submitted,

                                            By:   */s/ Matthew I. Fleischman*
                                                  Matthew J. Oppenheim
                                                  Kerry M. Mustico
                                                  Matthew I. Fleischman
                                                  OPPENHEIM + ZEBRAK, LLP
                                                  4530 Wisconsin Avenue NW, 5th Floor
                                                  Washington, DC 20016
                                                  Tel:  (202) 480-2999
                                                  Fax:  (866) 766-1678
                                                  matt@oandzlaw.com
                                                  kerry@oandzlaw.com
                                                  fleischman@oandzlaw.com

                                                  *Attorneys for Plaintiffs*